FILED

JUN 16 2022

DAVID CREWS, CLERK
BY_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 3:22CR75

MARION SHAUN LUND, D.P.M.                    18 U.S.C. § 1349
                                             18 U.S.C. § 1347
                                             18 U.S.C. § 371
                                             18 U.S.C. § 2

**The Grand Jury Charges:**

At all times relevant to this Indictment:

## GENERAL ALLEGATIONS

### Defendant and Introduction

1.    **MARION SHAUN LUND, D.P.M. ("LUND")**, of Lafayette County, Mississippi, was a doctor of podiatric medicine licensed in the State of Mississippi who had the ability to prescribe medications and order diagnostic testing.

2.    **LUND** owned, operated, and managed a podiatry clinic located in the Northern District of Mississippi with an in-house pharmacy, through which **LUND** prescribed foot bath medications and ordered molecular diagnostic testing for individuals throughout the State of Mississippi.

3.    As detailed herein, between approximately April 2016 and July 2021, **LUND** conspired to and engaged in a scheme to defraud the United States and health care benefit programs, including the Medicare program ("Medicare") and the TRICARE program ("TRICARE"), of more than $3.8 million.  To that end, **LUND** and his co-conspirators fraudulently formulated, prescribed, dispensed, and billed insurance companies, including Medicare and TRICARE, for foot bath medications produced and dispensed to individuals, which

circumvented federal regulations and approvals regarding use and efficacy and which exploited the manner in which health insurance companies reimbursed the dispensation of medications. In addition, **LUND** and his co-conspirators targeted and solicited individuals to provide biological specimens, such as toenails, and performed, and caused to be performed, medically unnecessary molecular diagnostic testing. Specifically, **LUND** and his co-conspirators sold signed doctors' orders along with individuals' biological specimens to a diagnostic laboratory, whereupon the laboratory performed medically unnecessary molecular diagnostic testing on the specimens and submitted false and fraudulent claims to health care benefit programs, including Medicare. In exchange for his participation in the scheme to defraud the United States and health care benefit programs, **LUND** conspired to and solicited and received kickbacks and bribes from a purported marketer acting on behalf of various pharmacies and diagnostic laboratories.

4.    Between approximately April 2016 and July 2021, **LUND** and his co-conspirators caused pharmacies with which they had financial relationships to submit false and fraudulent claims for medically unnecessary foot bath medications to health care benefit programs, including Medicare and TRICARE through interstate wire transmissions, in the amount of at least $2.9 million and were reimbursed at least $2.3 million. Between approximately December 2017 and May 2020, **LUND** and his co-conspirators caused the relevant diagnostic laboratory to submit more than $900,000 in false and fraudulent claims to health care benefit programs, including Medicare, through interstate wire transmissions, for medically unnecessary molecular diagnostic testing, which caused the laboratory to be reimbursed more than $200,000.

## The Medicare Program

5.    Medicare was a federally funded health insurance program that provided health care benefits to individuals who were 65 years of age or older or disabled. Medicare was administered

2

by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

6.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

7.     Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each Medicare beneficiary was given a unique Medicare identification number.

8.     Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered hospital inpatient care; Medicare Part B covered physicians' services and outpatient care; Medicare Part C covered Medicare Advantage Plans; and Medicare Part D covered prescription drugs.

9.     Physicians, clinics, and other health care providers, including pharmacies and laboratories (collectively, "providers"), that provided services to beneficiaries, could enroll with Medicare and provide medical services to beneficiaries. Medicare providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

10.     When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual. Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number; (b) the date upon which the benefit, item, or service was provided or supplied to the

beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

**Medicare Part B**

11.    Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for benefits, items, and services rendered to beneficiaries.

12.    Novitas Solutions, Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Regardless of where services were provided within jurisdictions JH and JL, Novitas received and adjudicated claims in, and paid claims from, Cumberland County, Pennsylvania. Claims submitted electronically from providers in Mississippi to Novitas necessarily traveled in interstate commerce to be adjudicated.

13.    Palmetto GBA, LLC ("Palmetto") was the MAC for consolidated Medicare jurisdictions JJ and JM, which included Alabama, Georgia, Tennessee, North Carolina, South Carolina, Virginia, and West Virginia. Regardless of where services were provided within jurisdictions JJ and JM, Palmetto received and adjudicated claims in, and paid claims from, Richland County, South Carolina. Claims submitted electronically from providers in Virginia to Palmetto necessarily traveled in interstate commerce to be adjudicated.

14.    To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS

Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

15.     In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

16.     Payments under Medicare Part B were often made directly to the providers rather than to the patient or beneficiaries. For this to occur, beneficiaries would assign the right of payment to providers. Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Medicare Advantage Program**

17.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans ("Medicare Advantage Plans"), rather than through Medicare Parts A and B.

18.     Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Part

5

A and Part B. To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

19.    A number of private health insurance companies, along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans. These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, specifically outside the States of Mississippi and Virginia, and often made payments directly to providers, rather than to the beneficiaries who received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

20.    To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms to the beneficiary's Medicare Advantage Plan. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information provided in Paragraph 10 of the Indictment.

21.    When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare. Providers also certified that the services being billed were medically necessary and were in fact provided as billed.

22.    The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the health insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a

6

Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month. CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each beneficiary's previous complaints, diagnoses, and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

### Medicare Part D

23.     In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare Part D drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors." UnitedHealthcare Insurance Company ("UnitedHealthcare"), Humana Insurance Company ("Humana"), and Wellcare Prescription Insurance, Inc. ("Wellcare") were Medicare sponsors. A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

24.     CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in the Medicare sponsors' plans. In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

25.     Typically, Medicare did not process its insureds' prescription claims directly. Instead, Medicare's drug plans were administered by pharmacy benefit managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

7

26.     A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Part D drug plan or with a PBM.  For example, Humana had its own in-house PBM whereas OptumRx was the PBM for UnitedHealthcare and CVS Caremark was the PBM for Wellcare.  Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers.  By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

27.     Upon receiving prescriptions, pharmacies submitted claims to Medicare or to PBMs for dispensing prescription drugs.  Medicare and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

28.     Electronic claims submitted to Part D drug plans or PBMs by pharmacies located in Mississippi or Louisiana necessarily traveled via interstate wire to be adjudicated.  For example, regardless of the location of the pharmacies that provided pharmacy benefits, Humana adjudicated claims submitted electronically in Jefferson County, Kentucky, OptumRx adjudicated claims submitted electronically in Carver County, Minnesota or Sherburne County, Minnesota, and CVS Caremark adjudicated claims submitted electronically in Maricopa County, Arizona.

29.     Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication."  42 U.S.C. § 1395w-102(e). Medicare generally did not cover drugs meant for prevention of disease and only covered drugs meant to treat an existing illness or injury.

30.     To prevent fraud, waste, and abuse, Medicare and PBMs required providers, including pharmacies, to collect copayments from beneficiaries prior to or soon after the service

or item was provided and specified that copayments could not be systematically waived or reduced. Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries financial incentives to reject medications that were not medically necessary or had little or no value to beneficiaries' treatments.

## The TRICARE Program

31.     The United States Department of Defense, through the Defense Health Agency, administered TRICARE, which was a comprehensive health care insurance program that provided health care benefits to United States military personnel, retirees, and their families.

32.     TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

33.     Providers meeting certain criteria could enroll with TRICARE and provide medical items and services to beneficiaries.  Providers would then submit claims, either electronically or in hard copy, to TRICARE seeking reimbursement for the cost of items and services provided.

34.     TRICARE provided prescription drug coverage to eligible beneficiaries through its pharmacy program, which was administered by Express Scripts, Inc. ("Express Scripts"), a PBM. Express Scripts' responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies.   Express Scripts also audited participating pharmacies to ensure compliance with its rules and regulations.  Regardless of the location of the pharmacy that provided pharmacy benefits, Express Scripts adjudicated claims submitted electronically in Middlesex County, New Jersey.

35.     Providers, including pharmacies, entered into contractual relationships with Express Scripts either directly or indirectly.  By contracting with PBMs, whether directly or

indirectly, providers agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

36.     Medically necessary services and supplies required in the diagnosis and treatment of illness or injury were reimbursable under TRICARE.  A provider seeking reimbursement had an obligation to provide services and supplies which were: (a) furnished at the appropriate level and only when and to the extent medically necessary; (b) of a quality that met professionally recognized standards of health care; and (c) supported by adequate medical documentation as may reasonably have been required to evidence the medical necessity and quality of services provided, as well as the appropriate level of care.

37.     A provider that was providing items or services and seeking TRICARE reimbursement had a further obligation not to: (a) submit claims for non-covered costs or non-chargeable services disguised as covered; (b) submit claims which involved flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders; or (c) submit claims which were false or fictitious, or included or were supported by any written statement which asserted a material fact which was false or fictitious, or included or were supported by any written statement that omitted a material fact which the provider had a duty to include and the claim was false or fictitious as a result of such omission.

38.     Express Scripts required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries at the time of billing and specified that copayments could not be systematically waived or reduced.

### Foot Bath Medications

39.     To be reimbursed for prescription medications, pharmacies submitted claims to

insurance companies identifying each drug or drug ingredient dispensed, including each drug's National Drug Code ("NDC") number, and were reimbursed accordingly.

40.     Health care benefit programs or PBMs typically reimbursed pharmacies the Average Wholesale Price ("AWP") of each drug ingredient dispensed, minus any negotiated discount.  AWP referred to the average price at which drugs or drug ingredients were sold at the wholesale level.  Drugs or drug ingredients with NDC numbers that reimbursed at high rates were called "high-adjudication."

41.     Podiatrists sometimes prescribed high-adjudication antibiotic and antifungal drugs ("high-adjudication foot bath medications") along with a plastic foot tub and instructed the beneficiary to compound the drugs themselves at home by mixing the medications with warm water in order to soak their feet.

42.     These high-adjudication foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections, and routinely included vancomycin 250 milligram capsules, calcipotriene 0.005% cream, clindamycin phosphate 1% solution, ketoconazole 2% cream, and other expensive drugs.   Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of these drugs were not subject to utilization management, meaning that there was no limit on the quantity of drugs that could be ordered in a single prescription.

43.     Starting in late 2019, health care benefit programs began limiting coverage of high-adjudication foot bath medications and auditing providers who were identified as high-volume prescribers of such medications.  In response, in mid-2020, pharmacies and other providers largely ceased dispensing foot spas and began dispensing high-adjudication foot bath medications with

different routes of administration besides a foot spa, including combining the high-adjudication foot bath medications with solution into a spray bottle to be sprayed on beneficiaries' feet or mixing the high-adjudication foot bath medications into a wash pan so that beneficiaries could soak their feet without the agitator provided by the foot spa.

### Molecular Diagnostic Testing

44.     Molecular diagnostic tests were laboratory tests that used polymerase chain reaction testing and metagenomics to extract DNA from fungi to determine whether different types of bacteria were present in the specimen provided.

45.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

46.     To conduct molecular diagnostic testing, a laboratory had to obtain a biological specimen from the patient. One way to obtain a biological specimen was to obtain nail clippings from a patient, and another way was to take a culture of a patient's wound. The biological specimen was then submitted to the diagnostic laboratory to conduct testing.

47.     Biological specimens were submitted along with requisitions, or doctors' orders, that identified the patient, the patient's insurance, and indicated the specific tests to be performed. In order for laboratories to submit claims to Medicare for molecular diagnostic tests, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.

**Relevant Entities and Individuals**

48.     North Mississippi Foot Specialists, P.C. ("NMFS"), formed in 2002 and located in Lafayette County, Mississippi, was a medical clinic that provided, among other services, podiatry treatment to beneficiaries.  In July 2016, NMFS opened a community pharmacy by the same name within the medical clinic that later was renamed and formed as Oxford Premier Pharmacy, LLC. Carey "Craig" Williams, D.P.M. ("Williams") owned and operated NMFS and contracted with Medicare, Medicare sponsors, and TRICARE to provide health care items and services to beneficiaries.

49.     Oxford Premier Pharmacy, LLC ("Oxford Premier Pharmacy"), formed in 2019 and located Lafayette County, Mississippi, was a community pharmacy also owned by Williams and located within NMFS.

50.     The Foot Doctor, PLLC ("The Foot Doctor"), formed in 2017 and located in Lafayette County, Mississippi, was a medical clinic that provided, among other services, podiatry treatment to beneficiaries.  **LUND** owned and operated The Foot Doctor and contracted with Medicare, Medicare sponsors, and TRICARE to provide health care items and services to beneficiaries.

51.     Specialized Clinical Pharmacy, LLC d/b/a iSave Pharmacy ("iSave Pharmacy"), formed in 2017 and located in Lafayette County, Mississippi, was a community pharmacy located within The Foot Doctor that was also owned and operated by **LUND**.

52.     Pharmacy 1, formed in 2017 and located in East Baton Rouge Parish and Jefferson Parish, Louisiana, was an open-door retail and mail-order pharmacy that specialized in the production and dispensation of high-adjudication foot bath medications and other high-adjudication medications.

13

53.     Pharmacy 2, formed in 2012 and located in Madison County, Mississippi, was an open-door retail and mail-order pharmacy that specialized in the production and dispensation of high-adjudication foot bath medications and other high-adjudication medications.

54.     Laboratory 1, formed in 2017 and located in Henrico County, Virginia, was an independent diagnostic laboratory.

55.     Logan Hunter Power ("Power"), of Lafayette County, Mississippi, solicited and recruited practitioners to write prescriptions for high-adjudication foot bath medications and other high-adjudication medications to be referred to various pharmacies and recruited practitioners to submit doctors' orders and biological specimens to various diagnostic laboratories, through his company, Power Medical, LLC.

### THE FRAUDULENT SCHEME

#### Overview

56.     **LUND** and his co-conspirators engaged in a scheme and artifice to defraud the United States, through Medicare, its sponsors, and TRICARE, by: (a) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of high-adjudication foot bath and other medications to be dispensed to beneficiaries by Pharmacy 1, Pharmacy 2, and other pharmacies; (b) prescribing medically unnecessary high-adjudication foot bath medications and other medications to beneficiaries; (c) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of molecular diagnostic testing to be completed by Laboratory 1 and other laboratories; (d) ordering medically unnecessary molecular diagnostic testing to be performed on biological specimens of beneficiaries; (e) submitting and causing the submission of false and fraudulent claims to Medicare, its sponsors, and TRICARE; (f) concealing and causing the concealment of false and fraudulent claims to Medicare, its

14

sponsors, and TRICARE; and (g) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Purpose of the Scheme and Artifice

57. It was a purpose of the scheme and artifice for **LUND** and his co-conspirators to unlawfully enrich themselves.

### Manner and Means of the Scheme and Artifice

58. The manner and means by which **LUND** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

<u>Foot Bath Medications</u>

a. In or around April 2016, **LUND** began prescribing foot bath medications through Pharmacy 2, which specialized in the dispensation of high-adjudication foot bath medications.

b. Pharmacy 2 created a series of preprinted, check-the-box prescription forms listing combinations of high-adjudication foot bath medications in order to encourage and direct practitioners to prescribe these specific high-adjudication combinations to beneficiaries, instructing beneficiaries to combine the medications themselves at home by mixing the medications into warm water in a foot bath provided by Pharmacy 2 and soaking their feet.

c. In or around July 2016, to maximize reimbursements from Medicare, its sponsors, TRICARE, and other health care benefit programs, **LUND** continued to prescribe foot bath medications through NMFS and Oxford Premier Pharmacy, which dispensed high-adjudication medications in large quantities to be dissolved in foot baths to beneficiaries, not based on evaluations of effectiveness or individualized patient need, but rather, based on foot bath medications being high-adjudication.

      d.     In or around July 2017, **LUND** entered into a purported Speaker Services Agreement with Pharmacy 2 whereby **LUND** would speak at physician dinners organized by Pharmacy 2 in exchange for compensation of $2,000 per speaking engagement or other amount mutually agreed upon by the parties.  This agreement was understood to be a veiled kickback arrangement.

      e.     In or around December 2017, **LUND** left NMFS and opened The Foot Doctor, where he began practicing full time.  In or around that time, **LUND** also opened iSave Pharmacy within The Foot Doctor.

      f.     Power was a medical sales representative who also made money by soliciting practitioners to send prescriptions, doctors' orders, and biological specimens to Pharmacy 1, Laboratory 1, and other health care providers.  Power was not a bona fide employee of these entities, but rather, received a percentage of the reimbursements paid to these entities by Medicare, TRICARE, and other health care benefit programs for referring prescriptions to pharmacies and doctors' orders and biological specimens to laboratories.

      g.     Power sought out and formed relationships with pharmacies that dispensed high-adjudication foot bath medications and solicited **LUND** to refer prescriptions for high-adjudication foot bath medications to those pharmacies with which Power had relationships.

      h.     In or around January 2019, Power entered into a purported employment agreement with Pharmacy 1 whereby Power would refer prescriptions for high-adjudication foot bath medications to be filled by Pharmacy 1 in exchange for thirty percent of the reimbursements received by Pharmacy 1 for those prescriptions, including prescriptions for beneficiaries.

      i.     Pharmacy 1 created a series of preprinted, check-the-box prescription forms listing combinations of high-adjudication foot bath medications in order to encourage and direct

practitioners to prescribe these specific high-adjudication combinations to beneficiaries, instructing beneficiaries to combine the medications themselves at home by mixing the medications into warm water in a foot bath provided by Pharmacy 1 and soaking their feet.

j.   **LUND** agreed with Power to prescribe high-adjudication foot bath medications to beneficiaries utilizing Pharmacy 1's preprinted prescription forms in exchange for a percentage of the reimbursements paid to Pharmacy 1 by Medicare, TRICARE, and other health care benefit programs for dispensing high-adjudication foot bath medications to beneficiaries and others.

k.   Beginning at least in or around April 2020, **LUND** utilized iSave Pharmacy primarily for the purpose of dispensing and billing for the dispensing of expensive foot bath medications. As owner of iSave Pharmacy, **LUND** necessarily received a percentage of the reimbursements paid to iSave Pharmacy by Medicare, TRICARE, and other health care benefit programs for dispensing high-adjudication foot bath medications to beneficiaries and others.

l.   **LUND** prescribed high-adjudication foot bath medications to, and authorized refills for, beneficiaries who were patients of NMFS and The Foot Doctor, and for other beneficiaries, regardless of whether the high-adjudication foot bath medications were medically necessary for the treatment of the individual patients.

m.   **LUND** routinely prescribed high-adjudication foot bath medications in contravention of the medically intended and accepted use of such medications. For example, ketoconazole was an antifungal cream indicated to be applied topically for the treatment of athlete's foot and other fungal infections. **LUND** frequently prescribed large quantities, often 1800 grams per prescription, of ketoconazole cream and directed beneficiaries to squeeze half a tube into a foot bath and soak twice daily, despite ketoconazole not being water soluble.

n.      In other cases, patients of **LUND** had no documented open wounds or bacterial infections, yet **LUND** still prescribed high-adjudication antibiotic foot bath medications.

o.      In mid-2020, when health care benefit programs began limiting coverage of foot bath medications, **LUND** began prescribing similar medications to be mixed by beneficiaries at home into water or solution and used in foot sprays or wash pans by beneficiaries, despite there being no medically accepted indication for mixing medications with water or solution and spraying them on one's feet or immersing one's feet in them.

p.      Despite knowing that remuneration could not be paid or received for referring prescriptions to Pharmacy 1 for beneficiaries, **LUND** solicited and received remuneration, namely kickbacks and bribes, from Power in exchange for his referring prescriptions ordering the dispensing of high-adjudication foot bath medications to beneficiaries.

q.      Notwithstanding that beneficiaries had the ultimate choice in providers, including pharmacies, due to the kickbacks paid by Pharmacy 1 to practitioners and marketers, beneficiaries were denied the ability to choose which pharmacy, if any, they desired to actually fill their prescriptions.

r.      With knowledge of iSave Pharmacy and Pharmacy 1's obligations with Medicare, its sponsors, TRICARE, and PBMs, to collect full copayments, at the direction of **LUND** and/or with his knowledge, iSave Pharmacy and Pharmacy 1 routinely waived or reduced copayments of beneficiaries and advertised to beneficiaries that they would have no out-of-pocket expenses.

s.      Upon receiving prescriptions authorized by **LUND**, Oxford Premier Pharmacy, Pharmacy 1, Pharmacy 2, and iSave Pharmacy submitted electronic claims through interstate wire transmissions to Medicare, its sponsors, TRICARE, and other health care benefit

18

programs, through their respective PBMs, seeking reimbursement for the high-adjudication foot bath medications prescribed.

   t. Oxford Premier Pharmacy, Pharmacy 1, Pharmacy 2, and iSave Pharmacy then dispensed, typically by mailing, high-adjudication foot bath medications to beneficiaries and others predicated upon prescriptions authorized by **LUND**.

   u. Medicare and TRICARE reimbursed Oxford Premier Pharmacy, Pharmacy 1, Pharmacy 2, and iSave Pharmacy's claims for dispensing high-adjudication foot bath medications, relying upon Oxford Premier Pharmacy's, Pharmacy 1's, Pharmacy 2's, iSave Pharmacy's, and **LUND**'s representations that the high-adjudication foot bath medications were dispensed based upon valid prescriptions and were medically necessary.

   v. From in or around April 2016 through February 2020, Medicare reimbursed Pharmacy 2 approximately $876,570.32 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND**. From in or around July 2016 through February 2020, TRICARE was billed approximately $132,002.58 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND** and reimbursed Pharmacy 2 approximately $45,311.76.

   w. From in or around July 2016 through January 2018, Medicare reimbursed Oxford Premier Pharmacy approximately $181,060.67 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND**. From in or around August 2016 through April 2017, TRICARE was billed approximately $65,525.51 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND** and reimbursed Oxford Premier Pharmacy approximately $18,649.51.

x.      From in or around January 2019 through June 2021, Medicare reimbursed Pharmacy 1 approximately $561,258.89 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND**.  From in or around January 2019 through April 2020, TRICARE was billed approximately $352,832.97 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND** and reimbursed Pharmacy 1 approximately $35,516.36.

y.      From in or around April 2020 through July 2021, Medicare reimbursed iSave Pharmacy approximately $504,572.53 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND**.  From in or around May 2020 through March 2022, TRICARE was billed approximately $233,822.72 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **LUND** and reimbursed iSave Pharmacy approximately $108,320.65.

59.    Additional manner and means by which **LUND** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

### Molecular Diagnostic Testing

a.      In addition to his relationships with pharmacies, Power sought out and formed relationships with diagnostic laboratories whereby the laboratories would pay him a percentage of the reimbursements received for testing of biological specimens referred by Power.

b.      In or around January 2018, Power entered into an agreement with Laboratory 1 whereby Power would receive twenty-five percent of the reimbursements received by Laboratory 1 after billing health care benefit programs, including Medicare, for conducting molecular diagnostic testing referred by Power.

20

      c.     Power approached **LUND** to determine whether **LUND** had an interest in partnering with him to send doctors' orders and biological specimens to Laboratory 1 in exchange for a share of the reimbursements that Power received from his referrals.

      d.     **LUND** agreed to send doctors' orders and biological specimens to Laboratory 1 in exchange for a share of the reimbursements received by Laboratory 1 for molecular diagnostic testing performed on the biological specimens.

      e.     **LUND** took toenail clippings and wound cultures from beneficiaries and others and caused those toenail clippings and wound cultures to be sent to Laboratory 1, regardless of whether the molecular diagnostic testing of toenail clippings and wound cultures was medically necessary for the treatment of the individual patients.

      f.     **LUND** typically requested a barrage of molecular diagnostic testing on the biological specimens, including testing for extremely rare organisms such as Mycobacterium and *Bartonella henselae*, the bacteria that causes "cat scratch disease."

      g.     At times, **LUND** requested molecular diagnostic testing for bacterial infections in patients that presented with fungal nail infections rather than with bacterial infections, rendering such tests medically unnecessary.

      h.     **LUND** acknowledged the lack of medical necessity for the orders for molecular diagnostic testing of toenails when he stated to Power, "I am sending samples on every fungal or dystrophic nail."

      i.     Despite knowing that remuneration could not be paid or received for referring biological specimens to Laboratory 1 for beneficiaries, nevertheless, **LUND** solicited and received remuneration, namely kickbacks and bribes, from Power in exchange for his referring biological specimens of beneficiaries to Laboratory 1.

j.      Although Laboratory 1 was required to collect full copayments from beneficiaries, Laboratory 1 did not make genuine efforts to collect copayments from beneficiaries.

k.      Laboratory 1 subsequently submitted electronic claims through interstate wire transmissions to Medicare, Medicare Advantage Plans, and other health care benefit programs, seeking reimbursement for the molecular diagnostic testing performed.

l.      From in or around December 2017 through May 2020, Laboratory 1 submitted approximately $957,098.28 in false and fraudulent claims to Medicare and Medicare Advantage Plans and was reimbursed approximately $229,896.75 for false and fraudulent claims submitted for molecular diagnostic testing of biological specimens submitted by or on behalf of **LUND**.

## COUNT 1

### The Conspiracy and Its Objects

60.     Paragraphs 1 through 59 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

61.     Beginning in or around April 2016, and continuing through in or around July 2021, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

**MARION SHAUN LUND, D.P.M.,**

did knowingly and willfully, that is with the intent to further the objects of the conspiracy, conspire and agree with Power, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, its sponsors, TRICARE, and other health care benefit programs, and to obtain, by means of

22

materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare, its sponsors, TRICARE, and other health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

      b.    to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

62.     It was a purpose of the conspiracy for **LUND** and his co-conspirators to unlawfully enrich themselves, as described in Paragraphs 56 and 57 of this Indictment, which are re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Conspiracy

63.     In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in Paragraphs 58 through 59 of this Indictment and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

23

## COUNTS 2-8

### The Scheme and Its Execution

64.     Paragraphs 1 through 59 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

65.     Beginning in or around July 2016, and continuing through in or around July 2021, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

### MARION SHAUN LUND, D.P.M.,

aiding and abetting and aided and abetted by Power, and others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, its sponsors, and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare, its sponsors, and other health care benefit programs.

66.     The scheme to defraud is more fully described in Paragraphs 56 through 59 of this Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

67.     On or about the dates specified below, in the Northern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **LUND** submitted and caused to be submitted the following false and fraudulent claims to Medicare and its sponsors for high-adjudication foot bath medications that were not medically necessary and not eligible for reimbursement, in an attempt to execute and in execution of the

scheme, as described in Paragraph 58 of this Indictment, with each execution set forth below forming a separate count:

| Count | Beneficiary | Program/ Sponsor/ Plan | Prescription Claim Number | Drug/ Quantity Dispensed | Approx. Date of Claim Submission | Approx. Amount Received |
|-------|-------------|------------------------|---------------------------|--------------------------|----------------------------------|-------------------------|
| 2 | K.P. | Medicare/ United Healthcare | Pharmacy 1 Prescription Number 216483 | Gentamicin 1800 grams | 7/1/2019 | $4,148.26 |
| 3 | L.P. | Medicare/ Wellcare | Pharmacy 1 Prescription Number 224202 | Erythromycin 1800 grams | 8/30/2019 | $2,379.52 |
| 4 | R.W. | Medicare/ Humana | Pharmacy 1 Prescription Number 224692 | Ketoconazole 1800 grams | 9/5/2019 | $1,368.50 |
| 5 | R.B. | Medicare/ Wellcare | Pharmacy 1 Prescription Number 239196 | Gentamicin 1800 grams | 1/14/2020 | $3,852.14 |

68.    Additionally, on or about the dates specified below, in the Northern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **LUND** submitted or caused to be submitted the following false and fraudulent claims to Medicare for molecular diagnostic testing that was not medically necessary and not eligible for reimbursement, in an attempt to execute and in execution of the scheme, as described in Paragraph 59 of this Indictment, with each execution set forth below forming a separate count:

| Count | Beneficiary | Laboratory 1 Diagnostic Test Claim Number | First Molecular Diagnostic Test Listed in CPT Code | Approx. Date of Claim Submission | Approx. Amount Claimed (Total Billed) |
|-------|-------------|-------------------------------------------|----------------------------------------------------|----------------------------------|---------------------------------------|
| 6 | D.H. | 900218313094720 | Detection Bartonella henselae and Bartonella quintana; 87471 | 11/9/2018 | $3,837 |

25

| 7 | C.E. | 900219064109620 | Detection Bartonella henselae and Bartonella quintana; 87471 | 3/5/2019 | $2,445 |
| 8 | E.P. | 900219074107650 | Identification of organisms by genetic analysis; 87150 | 3/15/2019 | $3,789 |

In violation of Title 18, United States Code, Sections 1347 and 2.

### COUNT 9
### The Conspiracy and Its Objects

69.     Paragraphs 1 through 59 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

70.     Beginning in or around January 2018, and continuing through in or around September 2020, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

**MARION SHAUN LUND, D.P.M.,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Power and others known and unknown to the Grand Jury, to:

a.      defraud the United States by cheating the United States government or any of its agencies out of money and property, and by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of Medicare and its sponsors and Medicare Advantage and the Department of Defense in its administration and oversight of TRICARE, in violation of Title 18, United States Code, Section 371; and to commit certain offenses against the United States, that is:

b.      to solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare and its sponsors, Medicare Advantage, and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B); and

c.      to offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, to any person to induce such person to purchase, lease, order, and arrange for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare, its sponsors, Medicare Advantage, and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

### Purpose of the Conspiracy

71.     It was the purpose of the conspiracy for **LUND** and his co-conspirators to unlawfully enrich themselves and others known and unknown to the Grand Jury by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in return for prescriptions for high-adjudication foot bath medications and orders for molecular diagnostic testing; (b) submitting and causing the submission of claims to Medicare, its sponsors, Medicare Advantage, and TRICARE for the dispensing of high-adjudication foot bath medications and the conducting of molecular diagnostic testing that were (i) medically unnecessary and (ii) obtained through the payment of kickbacks and bribes and not eligible for Medicare or TRICARE reimbursement; (c) concealing the submission of false and fraudulent claims to Medicare, its sponsors, Medicare Advantage, and TRICARE and the receipt and transfer of the proceeds of the

27

scheme; and (d) diverting proceeds of the scheme for the personal use and benefit of the defendant and his co-conspirators.

## Overt Acts

72.     In furtherance of the conspiracy, and to accomplish its objects and purpose, **LUND** and his co-conspirators committed and caused to be committed, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the following overt acts:

a.      In or around January 2018, Power entered into an agreement with Laboratory 1 whereby Power would receive twenty-five percent of the reimbursements received by Laboratory 1 after billing insurers, including Medicare and Medicare Advantage, for conducting molecular diagnostic testing referred by Power and ordered by **LUND** and other providers.

b.      In or around January 2019, Power entered into a purported employment agreement with Pharmacy 1 whereby Power would receive thirty percent of the reimbursements received by Pharmacy 1 after billing insurers, including Medicare, its sponsors, TRICARE, and other health care benefit programs, for dispensing medications referred by Power, including high-adjudication foot bath medications prescribed by **LUND** and other providers.

c.      Power, Pharmacy 1, Laboratory 1, and others tracked the high-adjudication foot bath medications and diagnostic test orders referred by Power, in addition to the reimbursements received from Medicare, its sponsors, TRICARE, and other health care benefit programs, and the amounts of the kickback and bribe payments.

d.      On December 28, 2017, Power texted **LUND**, "Saw the two wound cultures go through. Well done sir." **LUND** responded, "Nice, more where that came from." Power replied, "About 75-100 a pop for you for Medicare patients."

28

e.     On February 12, 2018, Power texted **LUND**, "You got a little something from your samples." **LUND** responded, "Yeah they sent me a thing saying I was getting 100 bucks." Power texted back, "That was for one sample FYI."

f.     In May 2018, as remuneration for submitting biological specimens collected from beneficiaries to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare and Medicare Advantage, Power paid **LUND** a kickback of approximately $900, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and Medicare Advantage.

g.     On September 26, 2018, **LUND** texted Power, "'my b**** better have my money, my h* better have my cash.'" Power responded, "Get rich or die trying." **LUND** texted, "Exactly." Power replied, "I need you to lead me to the promised land." **LUND** texted, "Working on it." Then, **LUND** texted, "I'm just here to help you keep your pimp hand strong." Power responded, "Trying to get on your level," and then texted, "You know the rules though. End of every month is payment." **LUND** texted, "I might need your help to make it to November. I got 99 problems." Power responded, "Dang man. Last time I talked to you, you were collecting like a savage."

h.     In September 2018, as remuneration for submitting biological specimens collected from beneficiaries to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare and Medicare Advantage, Power paid **LUND** a kickback of approximately $900, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and Medicare Advantage.

i.     On October 4, 2018, Power texted **LUND**, "Pulling in to oxford. I'll swing by." **LUND** responded, "Call [sic] man. See you in a few. Come to the back door."

29

j.      In October 2018, as remuneration for submitting biological specimens collected from beneficiaries to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare and Medicare Advantage, Power paid **LUND** a kickback of approximately $1,100, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and Medicare Advantage.

k.      On December 5, 2018, Power texted **LUND**, "Dude give me one month of 5 [soaks] a day. And I'll send you . . . to Hawaii." **LUND** responded, "Lol." Power replied, "Not joking. Delete that before I get arrested though."

l.      On March 1, 2019, Power texted **LUND**, "That was code for what do you want me to do with your earnings." **LUND** responded, "Bring it. Chasing dollars today." Power texted, "Can I get it to you Monday?"

m.      In March 2019, as remuneration for submitting biological specimens collected from beneficiaries to Laboratory 1 for molecular diagnostic testing that was reimbursed by health care benefit programs, including Medicare and Medicare Advantage, Power paid **LUND** a kickback of approximately $1,800, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare and Medicare Advantage.

n.      On June 8, 2019, Power texted **LUND**, "You still in office?" **LUND** responded, "Of course." Power replied, "Dividend? That's code^." **LUND** texted back, "Sure. Come down."

o.      In July 2019, as remuneration for prescribing beneficiaries high-adjudication foot bath medications that were dispensed by Pharmacy 1 and reimbursed by health care benefit programs, including Medicare, its sponsors, and TRICARE, and as remuneration for submitting biological specimens collected from beneficiaries to Laboratory 1 for molecular

30

diagnostic testing that was reimbursed by health care benefit programs, including Medicare and Medicare Advantage, Power paid **LUND** a kickback of approximately $1,300, representing a percentage of the reimbursements paid by health care benefit programs, including Medicare, its sponsors, Medicare Advantage, and TRICARE.

        p.     From in or around December 2017 through May 2020, Laboratory 1 received approximately $229,896.75 in reimbursements from Medicare for conducting molecular diagnostic testing of beneficiaries ordered by **LUND**.

        q.     From in or around January 2018 through May 2020, Laboratory 1 paid approximately $140,557.76 in kickbacks to Power, through his company, Power Medical, LLC, for the referral of orders for molecular diagnostic testing by **LUND** and others.

        r.     From in or around January 2019 through June 2021, Pharmacy 1 received approximately $561,258.89 in reimbursements from Medicare for dispensing high-adjudication foot bath medications prescribed by **LUND**.

        s.     From in or around February 2019 through August 2020, Pharmacy 1 paid approximately $121,362.56 in kickbacks to Power, through his company, Power Medical, LLC, for the referral of prescriptions for high-adjudication foot bath medications by **LUND** and others.

        t.     In turn, from in or around January 2018 through in or around September 2020, Power paid approximately $16,200 in cash kickbacks to **LUND**.

All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATIONS

73.     Upon conviction of any of the offenses set forth above, the defendant, **MARION SHAUN LUND, D.P.M.**, shall forfeit to the United States any property, real or personal, that

constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7).

74.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

b.     has been placed beyond the jurisdiction of the Court;

c.     has been substantially diminished in value; or

d.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL:

_____          /s/ Signature Redacted_____
CLAY JOYNER                                                          FOREPERSON
UNITED STATES ATTORNEY

32